25-2080, Luis Gomez-Echeverria, et al. v. Purpose Point Harvesting, LLC, et al. Arguments not to exceed 15 minutes per side. Mr. Alvarez for appellant. Okay. Very well. Well, why don't we just call the case and we'll do a single argument. If he shows up, he shows up. But I think we might have some questions for the appellees. So let's hear from the appellees. Good morning. Good morning. May it please the court. Jessica Muggler for plaintiffs in this case. Defendants asked the court here to overturn the product of an eight-day federal jury trial in which the jury heard ample evidence of blatantly illegal human trafficking. That evidence included that defendants took plaintiffs' passports and visas and kept them while they were in the U.S. Defendants also charged an illegal recruitment fee of $2,500 to plaintiffs to come to the U.S. And they added themselves to plaintiffs' bank accounts without plaintiffs knowing and wrote checks out of those accounts. And defendants also severely underpaid plaintiffs and kept woefully inadequate records supporting that pay. We ask the court to affirm. And it's important to note here up front, Your Honors, that the trial judge in this case had the benefit of overseeing the case for years before the trial. And the trial judge heard the evidence as it came in at trial. And the jury heard the evidence, including that that I just mentioned, and found defendants liable of trafficking and awarded appropriate damages. And I will start with punitive damages here. And again, I'll note this was a labor trafficking trial. As we quote on page 31 of our brief, courts routinely hold that trafficking in violation of the TVPRA is a particularly depraved act that warrants punitive damages. And that's from Machal v. Machal, again on page 31 of our briefs. And defendants' argument here is that because the jury did not award non-economic damages or physical harm damages, that there can be no reprehensible conduct supporting punitive damages here. But that's not the law. Punitive damages and compensatory damages for economic or non-economic harm serve different purposes. Punitives are meant to deter and punish. And both Supreme Court cases and Sixth Circuit cases all hold that punitive damages are allowed in solely economic harm cases. What's the best authority for that proposition? Because I thought maybe that was an issue of first impression. Your Honor, we cite cases on page 23 to 24 of our brief. And I'll point to a few of those. That's including Tisdale v. Federal Express Court. That's a Sixth Circuit case from 2005. In that case, it was a Title VII case that awarded back pay for racial discrimination and $100,000 in punitives. And so the back pay was solely economic harm, but there was $100,000 in punitives that was affirmed by Sixth Circuit court. Was the issue raised, though? I mean, I know that must be the facts of the case. But did they raise the issue that it is unconstitutional or a violation of law or whatever to award punitive damages without non-economic damages? Was the issue squarely addressed? The issue was not squarely addressed in that case, Your Honor. Is there authority anywhere that it squarely addresses the issue? Well, I'll point you to BMW v. Gore, which did hold that they say solely economic harm can warrant substantial penalties. And they go on to apply the three guideposts enumerated in Gore to the punitive damages analysis. And I'll point the court to one case that was not in our briefing, but we found thereafter. It's a Sixth Circuit case from 2025, McPherson v. Suburban Ann Arbor LLC. It's 135 F. 4th 419 against Sixth Circuit 2025. And in the lower court, the defendants did argue that it was purely economic damages and that because of that, the punitive damages were excessive. The Sixth Circuit affirms the punitive damages award of $350,000 to actual damages of $38,000. So that's a 9.2 to 1 ratio. And they did not get into the exact economic versus non-economic harm in the Sixth Circuit. But that was argued in the lower court and affirmed by this court. And again, there's numerous cases where the punitive damages award is affirmed where the damages are solely for economic harm. Back pay, damages for contract breach, and the like. And I'll point the court to one more case on page 23 of our brief, which is Kolstad v. American Dental Association. It's a U.S. Supreme Court case from 1999. And while they did not address the point that we're talking about here, they did remand the case for punitive damages solely for a back pay case. In this case, you asked for non-economic damages, did you not? Yes, Your Honor. To me, if the conduct is so irreprehensible that punitive damages are awarded, it seems to me that the jury probably should have awarded you non-economic damages. Can you explain to me why you think they didn't do it here? Well, Your Honor, getting into the deliberations and thought process of the jury would be somewhat speculative. Sure it is. I guess I'm asking you to speculate, because to me it seems a little bit counterintuitive that I think I would have expected them to come back with non-economic damages since they awarded significant punitive damages. And I'm just trying to think, why would they do this? Yes, Your Honor. If we're speculating. In our minds, we think that the jury probably lumped it all together into punitives. Is that allowed? Well, for reprehensible conduct, if it meets the Gore Guidepost, then yes it is. Nothing in the law requires economic damages. Yeah, okay, but if they award punitive damages for non-economic reasons, though, that wouldn't be permissible. I mean, the jury instructions aren't at issue here. But to award punitive damages, they must have found what the instructions required them to find for punitive. But non-economic damages, it's a different standard, that's all. It's probably a lower standard. So if they lump that into the punitive, then they're maybe making an error of law. Well, as you say, Your Honor, it's different. It's different analyses, it's different standards. For punitives, it's meant to deter and to punish. And they found significant compensatory damages here. They found significant evidence supporting those economic damages. And as we cite in our briefs, a lot of evidence of intentional violations of the human trafficking laws and taking advantage of financially vulnerable plaintiffs. And all that evidence supports the jury's award of punitives here, even for solely economic harm that they found. They found economic harm based on evidence that they were severely underpaid, they had to pay a recruitment fee to get over here, they had to pay travel fees. And we are allowed to look at potential damages or potential harm as well in the Reprehensible Conduct Guidepost. And we put on evidence that the potential pay that they were shorted by defendants was a lot greater than even the timesheets showed and that the records showed. Because, again, the defendants did not keep adequate records. They kept no records of the amount of crops that plaintiffs picked. And under the H-2A visa program, the defendants were required to pay plaintiffs the greater of either the hourly rate or the rate at which they picked crops. So the potential harm is also very great in this case, solely on an economic basis. And I think the jury was well-founded. I mean, we cite a lot of evidence on pages 28, 25 to 28 of our briefs regarding the intentionality of the violations of defendants and the financial vulnerability of plaintiffs. And defendants do not even address that evidence in their reply brief. They do not mention any of the many facts that we cite in our briefs regarding the intentionality and financial vulnerability. And as Gore teaches us, that's enough to find reprehensible conduct here. Again, this was a trafficking case. The purposes of the constitutional limits of punitive damages are to prevent damage awards that are so grossly excessive or grossly disproportionate so as to not provide notice to the defendants of the potential harm. Here, whatever you can say about non-economic versus economic, it's clear that defendants had notice of the potential punitive damages against them. They intentionally violated human trafficking laws for years against numerous plaintiffs. Well, they're arguing that the ratio is too high, but the only ratio that is somewhat high is Herville, I think. It's 1 to 9. The other ones are 1 to 4 or 1 to 3. Yes, and Your Honor, on a collective basis, the ratio is 4.69 to 1. Yeah, but you have to look at it individually, don't you? Well, defendants don't cite any cases that say that. But regardless, Herville is still within the single-digit, I believe, ratio, or he's well below cases that have affirmed much larger punitive damages ratios, especially in the face of such reprehensible conduct as here. The other issue that I'm somewhat concerned about that I've never seen in my career is a spectator being forcibly asked to leave the courtroom when the spectator hasn't done anything. I mean, I've seen spectators being ordered to exit the courtroom when they've acted up, when they're not behaving properly. But Lewis's ex-romantic partner was just sitting in the audience and then told to leave. It's really unusual. I know you say they consented to it, but I guess you've got to concede it's somewhat unusual and it might be somewhat prejudicial. Well, Your Honor, it may be unusual, but as you know, she was asked to voluntarily leave by defense counsel themselves. She was not made to forcibly leave. She was asked to voluntarily leave, and that's solely because, for whatever reason, it affected Lewis's state of mind while he was a witness on stand, and defendants did not have any objections to asking her to voluntarily leave. Didn't they say they absolutely didn't have any objections? They actually consented to it. Yes, they consented to it. They said they absolutely have no objection. I've just never seen it before. Yes, yes, Your Honor. It was a very unusual circumstance in which, again, we have defendants on trial here for human trafficking. They bring in the ex-partner of Lewis, Plaintiff Lewis, who had no relation to this case whatsoever. You said they brought him in. Did they concede that they brought this person in to be a spectator, or did they? They do not concede that, but they do concede that they spoke with her the night before and knew she would be there and did not give us any notice. Okay, you just told me they brought her in. I may have misspoke, Your Honor. I did not mean to say they brought her in. I meant to say that they're on trial for human trafficking, and she comes into the courtroom, and it very much affects Lewis. He believes that they brought her in to intimidate him. They have not conceded that, but the judge did find that all evidence points in that direction. Now, I understand that is an unusual situation, but the point of the matter is that the judge made a careful, well-reasoned decision on this mistrial motion. She asked for briefing on it. She asked for argument on it, and she considered it, and she exercised her discretion in a lawful manner. And, again, she saw all the testimony and the evidence as it came through in court and did not abuse her discretion. She was well within her discretion to deny the mistrial motion. Any prejudice here was cured by the curative at the end, which told the jury that the testimony was stricken and to disregard it, and juries are assumed to follow curative instructions. All right, I'm going to give you a rebuttal. This is a little unusual procedure here.  But because we're going out of order, I'll give you five minutes rebuttal. I appreciate that, Your Honor. But any questions for the counsel at this time? No, I think none at this point. Thank you, Your Honor. All right. Good morning. Good morning, Your Honor. Robert Anthony Alvarez for the appellant. I apologize. Where have you been? I was directed to a different courtroom, so I was sitting waiting my turn. Oh, okay. I'm sorry. That's okay. I was directed to another courtroom. Not a problem. All right. You got the tail end of it. I allowed them to argue. And we started out with the putative damage issue that you raised, that it's contrary to law to award putative damages without awarding non-economic damages. And they cited some cases where it's been allowed, although I don't think there's a case directly on point, but you might want to address that. Certainly, Your Honor. I want to point out that sister counsel has said that this is a human trafficking case, a labor trafficking case, and that is exactly what was alleged, exactly what the trial was about. And in that context, the jury who listened to eight days of testimony, well, seven days of testimony, they found no physical injury, no loss of liberty, no mental anguish, no fear, no pain and suffering, no humiliation, no other form of non-economic harm, and yet they did find in favor of the plaintiff. And what they found and what they awarded were wages and the recruitment fee violations. And yet they still awarded $455,000 in punitive damages. And that's what we're saying is the problem with this issue is that the jury made a decision based on wages but based on emotion and not regarding what was actually before them. And this actually goes, Your Honor, to your point regarding the spectacle. It's the first time I've ever had anything like that happen in my 20-plus years as well. And so the spectator issue came up on the second day of trial. I want to be clear about that. This was the second day of trial at 4.02 p.m. when the plaintiffs called the main, Mr. Echavidia, to the stand and then prefaced their questioning by saying, we have ten preliminary questions before we get started. And after their first question, I objected. I objected and I said, relevance. The response was, and this is, again, in front of the jury, second day of trial, second witness that's spoken at trial, it goes to his state of mind right now and his ability to tell the truth and make sure that there's no pressure from the audience. This is from counsel in response to my objection. Okay, what was the preliminary question again? The preliminary question was, do you know anybody in the audience? Yeah, do you know anybody in the audience? And how do you know them? I'm sorry. So you objected, and what did the judge do? After the response, the judge gave some leeway. Did the judge sustain your objection? I'm sorry? The judge did not sustain your objection? No, gave some leeway. There was no overruling my objection. There was no sustaining. What leeway? I mean, it seems to me like that is an improper question without a foundation, but okay. Correct. What leeway did he give? Well, allowed them to ask a couple more questions, Your Honor. So the next question after that from counsel was, how does it make you feel about the safety of your children that your ex-girlfriend is here? I, again, objected and said, this is irrelevant, lack of foundation. And their response was, two more questions and then I'm done. The judge said, well, you need to respond to the objection. And the response was, relevant to the state of mind right now and being able to testify with this person in the room and who she is surrounded by. I, again, objected. No foundation as to why the kids are even relevant at all at this point. The judge overruled my objection, gave her some more leeway, and so then the witness was able to answer, and the witness said, I feel like she's here or that they brought her here to pressure me. I want to tell the judge the truth. I want to tell the jury, the judge and the jury, I feel like they're pressuring me so I can't tell you the truth. And then follow-up question. You objected to that, too? Did you ask that that answer be stricken? I did not object at that point, Your Honor. I should have, but I did not. And the follow-up question almost immediately was, do you think you can overcome that pressure to testify or would you like the court to ask her to leave the courtroom? His response, I would ask, please, for the court to take her out of here. Your argument is this is just a setup, and what you read there really sounds like it is a setup. It was a setup, Your Honor, because this spectator whom I had not seen, I didn't know who she was when the judge asked me to escort her out, I had to go ask my client who she was. So I didn't know who she was. Okay, so did you consent to her being excluded from the courtroom before you knew who she was? Your Honor, so they told me that it was the girlfriend, and so I knew that there was that connection. Okay, you had taken the deposition of the girlfriend. You knew that she had some ---- I did not take the deposition of the girlfriend. Well, the deposition had been taken, had it not? The deposition of the plaintiff had been taken, and we spent about maybe 20 minutes of the deposition speaking about his past, his background, and his girlfriend, yes. Okay, and my understanding is she had some details about their marriage and stuff that was embarrassing, and he's worried that's going to come out with a girlfriend and all that stuff.  Right. But it didn't appear there would be anything related to what was at risk. It's not related to the case, I know, all right. And the problem with that is, Your Honor, that what happened was the jury went into this case on day two with a clear lens. When this spectacle happened, they then had a smudge on that lens, which carried through to the last day of trial. As a matter of fact, on the last day of witness testimony ---- Oh, and also I want to mention that this happened at 4.02. At 4.10, we had our sidebar. The spectator was escorted out, and then we had some more questioning of the main witness, and then we stopped at 5 o'clock. So the jury was left with that spectacle in mind overnight, at the very least overnight. And then we had the mistrial oral argument in the morning. That was not allowed, and we continued with the rest of the trial. But on June 5th, which was the Thursday before the last day of trial, before the case was submitted to the jury, the judge referenced, and this is at page ID 8283, the judge referenced additional spectators that had showed up that day. She said, and she's addressing the spectators in the audience. She goes, And it was observed that one of you, at least, was looking menacingly at the plaintiffs. It was noticed by the jurors. So that means that one of the jurors had to have mentioned something to either a court officer or to a clerk, something. And so the problem that I have with that, Your Honor, is that as I brought up in my mistrial brief and in my motion, is that it tainted the trial and the judge herself. They argued that you brought in the ex-girlfriend. That's what they claimed, but we did not. You say they set up the spectacle. They argued, No, you set it up by bringing the girlfriend in. Did you bring the girlfriend in? No. As I mentioned at the sidebar, the only time that she was mentioned to me was that she had called to let them know because they're all related. So the girlfriend is family to the plaintiff and is family, obviously, to the plaintiff and to the defendant. And so she was calling to let them know that she was coming. My clients, when we were having this conversation the night before, they mentioned, She says she's on her way. We don't know what's going to happen. We don't know why she's coming, but she's on her way. That's all that I knew. And there was nothing related to her that would have impacted the trial in any way. She was never deposed. She was never a part of any trafficking. So there was no concern at all. Now, the judge herself mentioned that during the sidebar, she acknowledged that it created a problem. She goes, It's probably something we shouldn't have done in front of the  We should have had a sidebar to resolve it so we don't poison the jury. And now we have a one-sided view, but at the minimum, let's get her out. Okay? And she was right. What happened was it poisoned the jury. It smudged the lens of the jury in viewing the evidence, and it carried through to the last day of trial. And that's what I think one of the contributing factors to this disproportionate award of punitive damages. Because they found no physical injury. They found none of the hallmarks of a trafficking case. My question is, are you suggesting that the jury couldn't award punitive damages at all because there were no compensatory damages? Or are you suggesting because there were no compensatory damages, the punitives should have been significantly less? I would say that because this is a trafficking case, because of the nature of the claims that were presented and the story that were presented, this web of control, systematic web of control, that if the jury didn't find that there was any kind of dignity harm or any kind of harm whatsoever or coercion even, then no, there should not have been any type of punitive damage award. Do you have authority that says there can't be under those circumstances? I do not, no. And I have 47. The Supreme Court suggested otherwise that just purely economic injury can be a basis for punitive damages. I'm sorry, what was that again, sir? Hasn't the Supreme Court said that a purely economic injury can be the basis for punitive damages? I believe, and I apologize, I know that there was some mention of economic damages, but I believe it has to be if there is some sort of indicia of reprehensible harm at least in the finding. And here you have none of that because there was absolutely no finding, no award, with regard to any kind of non-economic damages. Thank you. All right. Rebuttal for the appellees, I guess. Thank you, Your Honor. Jessica Mugler again for plaintiffs. So let me just pick up real quick on the punitive damages where he ended, and he admits that the Supreme Court has said that solely economic harm can be the basis for punitive damages. And any speculation that the situation with the denial of mistrial contributed to the jury's award is just that, speculation. He says that one of the jurors noted that they saw spectators looking at the plaintiffs menacingly on June 5th, but that was because the defendants brought in a whole group of their purpose point workers to sit in the courtroom and stare at the plaintiffs, and the jury brought that to the court. That had nothing to do with the ex-girlfriends. That was a week later. And as you know, Your Honor, regarding the denial of mistrial, if anything was a setup here, it was the girlfriends coming to court after they had already spent a very long time during the deposition of Luis asking about the girlfriend, hammering on that, and embarrassing him so much that he cried, and he asked the defendants to stop laughing at him during the deposition. They knew this history. They knew that she was coming that day to court. They knew that she was going to be there on the exact day that Luis was set to testify because we had given them notice the night prior, and still they did not give us any notice or somehow... Once you concede that your questions about the girlfriends sitting in the audience were totally improper... No... I mean, you know, you normally can't question about people. It's a public courtroom. Anybody's allowed to come into a public courtroom, and normally you don't question a witness as to people that are witnessing a public trial. I mean, I don't see the relevance. I think it's... Probably you didn't establish the foundation for it, I suppose. And, Your Honor, what I'll say is the questions were not so much about or were not so much meant to elicit the relationship with the ex-girlfriend but so much as Luis's state of mind when testifying because even the trial judge noted on the record that he was distraught and emotional and he was having trouble being up there. It was important for us to explain that to the jury. They're sitting there looking at him. This is the start of his testimony, isn't it? It is the start of his testimony. I could see if he's testifying and all of a sudden he gets emotional, you could ask, well, why are you emotional? And then you could explain it. But just to go off at the start of the bat and say, does this bother you with leading questions like that and... Well, he already... Yes. It strikes me as improper whether it's enough prejudicial to warrant a new trial as a different act. Yes. Whether they consented to it is another issue. Yes, I agree, Your Honor. And he already was emotional when getting on the stage. That's why it was at the beginning. He was? He just started out emotional? Yes, because he had already... There was a witness that was on before him and he saw the girlfriend come in during that witness. Okay. Well, that's one of the problems when we have a cold record. We can't see that. And, Your Honor, that is why the judge has discretion in this situation as she sees the evidence coming in, and that's why it's an abusive discretion standard as she saw all of it as it came in, took into a lot into her decision. As I said, we did briefing over the weekend on the mistrial motion. She then, we talked about it multiple times with the trial judge, and she exercised her discretion in denying that motion. All right. She gave a curative instruction? She did give a curative instruction. Did they consent to the curative instruction? They did consent to the curative instruction. That's a good point, Your Honor. If they had been so concerned with the jury seeing the girlfriend ask to voluntarily leave, why did they not ask for a curative right then and there? Why did they not ask for an immediate curative instruction or to strike the testimony? They did ask for the mistrial the next day, right? The next morning. It was like 4, 10 in the afternoon, the next morning. So the mistrial was timely, wasn't it? The mistrial was timely. There's no doubt about that. It's that if they are arguing that there was prejudice, then they did not ask to strike or cure it immediately right thereafter. Isn't one concern that brings more attention to it if you ask for a curative instruction right then? Well, I mean, their argument is that there was already a lot of attention brought onto it, no matter what. Curative instructions are presumed for juries to follow them and for that to strike the testimony. They never asked to strike the testimony then, and if they're worried about it already making a big scene, then that shouldn't really be an issue. But regardless, they made that strategy decision to offer the curative at the end of trial. They consented to that. They agreed to the language, and that's presumed to cure prejudice here. Their argument is that it tainted the trial from the second day on. Did you pick up on it? I mean, at closing, did you argue that the defendant manipulated, coerced the workers, threatened them and everything else, including bringing in the girlfriend? I mean, did you pick up that and put that in there? No, Your Honor. You didn't argue that in closing? I believe at that point we already knew that the judge was going to strike that testimony, so we did not argue that, given that she struck the testimony. So it wasn't emphasized. It was supposed to be disregarded by the end of the trial.  It wasn't unduly emphasized. Tell me why. I mean, they say, okay, all this stuff, it's overly prejudicial, it requires a mistrial, a new trial. Tell me why it's not overly prejudicial. Well, Your Honor, we look at five different factors to determine whether or not the judge abused her discretion in denying the mistrial. First of all, we review for abuse of discretion, which is a very high standard. Yes, Your Honor, it is a very high standard. The judge is well within her discretion here to deny the mistrial. Looking at those five factors, I can answer any questions about each of the five factors, or I can go through each one, if Your Honors would like. Just do it briefly, if you would. Briefly, yes. So the first factor is whether there was a reasonable line of questioning and whether the questioning was asked in good faith. Two different factors. Again, here, the line of questioning was to establish his mental state and state of mind when testifying. And we cite case law in our brief that that is a relevant thing to put in front of the jury. Again, as the trial judge noted, he was already distraught when getting up there and we, as counsel for him, had a duty to let the jury know why he was appearing this way. And then we go to was any prejudice cured? And again, we cite case law showing that curative instructions in other cases were enough to cure, and that's the same as here. The curative instruction at the end of trial struck the testimony and instructed the jury to disregard the testimony altogether. As we noted before, we did not mention the testimony whatsoever again after the episode on the second day. So the curative instruction here cured any prejudice that may have arisen, and that's what the judge found as well in looking at all of the evidence that came in. And the last factor is whether that testimony is a small part of the evidence against defendants or whether it is a large part. And here, it was only a small part of the vast amount of evidence against defendants that they exercised force, fraud, or coercion in trafficking plaintiffs. And there's no real dispute over that. The defendants themselves admitted that there was a lot of evidence of coercion that came in through this trial. Any intimidation that Luis testified to here was only a small part of that vast amount of evidence that came in throughout trial of trafficking. I've already mentioned a few of those facts here. But again, took their passports and visas and withheld them. That's blatantly illegal. Recruitment fee, again, blatantly illegal. Signing themselves to plaintiff's bank accounts. These were the larger part of the evidence that was put on. Thank you. Any further questions? No. 30 seconds. If I may, just real quick. 30 seconds. Thank you, Your Honors. All right. Sure. Go ahead. Thank you. I just want to reiterate one point on the spectator. What happened, Your Honors, is that this provided a live-action, real-time validation of the theory of the plaintiffs that my clients operated via a culture of fear and witness intimidation. It is one thing to say that my boss intimidates me in the field. It's another one to point into the gallery and say they're intimidating me right now. And that is exactly what happened in front of the jury and in front of the judge. Thank you. Thank you. All right. Case will be submitted.